NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13794

COMMONWEALTH  vs.  CHERI DOBSON.


Suffolk.     October 8, 2025. – July 17, 2026.

Present (Sitting at Fall River):  Budd, C.J., Gaziano, Kafker,
          Wendlandt, Georges, Dewar, & Wolohojian, JJ.


Search and Seizure, Motor vehicle, Fruits of illegal search,
     Consent, Search incident to lawful arrest.  Constitutional
     Law, Search and seizure.  Motor Vehicle, Firearms.
     Consent.  Firearms.  Controlled Substances.  Practice,
     Criminal, Motion to suppress.


     Indictments found and returned in the Superior Court
Department on March 27, 2023.

     A pretrial motion to suppress evidence was heard by Sarah
Weyland Ellis, J.

     An application for leave to prosecute an interlocutory
appeal was allowed by Kafker, J., in the Supreme Judicial Court
for the county of Suffolk, and the appeal was reported by him to
the Appeals Court.  The Supreme Judicial Court on its own
initiative transferred the case from the Appeals Court.


     Mathew B. Zindroski (Dmitry Lev also present) for the
defendant.
     Darcy Jordan, Assistant District Attorney, for the
Commonwealth.

DEWAR, J.  The defendant, Cheri Dobson, appeals from the denial of her motion to suppress evidence recovered from the locked glove compartment of her vehicle during a traffic stop by police for a civil window tint infraction.  During the stop, police repeatedly requested that the defendant give them her car key so that they could unlock the glove compartment, where they suspected they would find contraband.  The defendant refused these requests and struggled with officers when they attempted to handcuff her.  Once handcuffed, the defendant continued to refuse police requests for the key, which the officers believed she had hidden on her person during the struggle.  The officers performed a series of increasingly intrusive searches of her person to locate the key, none of which succeeded in locating it.  Shortly after the final and most intrusive search, the officers informed the defendant that a trained dog had alerted to the presence of firearm evidence in the glove compartment, and they continued to urge her to surrender the key, telling her that towing and searching her vehicle without a key would damage the vehicle.  She then retrieved the key from where it was hidden and handed it to the officers.  The police used the key to unlock the glove compartment, where they found a firearm and pills.

A Superior Court judge concluded that the police searches of the defendant's person violated her rights under the Fourth

Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights, because the searches exceeded the limited scope permissible "where an officer has reasonable suspicion that the suspect is armed and dangerous." Commonwealth v. Torres-Pagan, 484 Mass. 34, 36 (2020). The judge nonetheless denied the motion to suppress on the ground that the defendant validly consented to the search of the glove compartment when she handed police the key they had been seeking, concluding that the consent was sufficiently attenuated from the unconstitutional searches of the defendant's person.

We begin by rejecting the Commonwealth's argument, raised for the first time on appeal, that the final and most intrusive search of the defendant's person was lawful as a search incident to her arrest for assault and battery on a police officer. Under G. L. c. 276, § 1, a search incident to arrest may be made only for the purpose of obtaining evidence of the crime of arrest or removing weapons that might be used to resist arrest or escape. Here, undisputed factual findings of the motion judge establish that the searches of the defendant's person violated the statute because the searches' purpose was to investigate a different crime from the one for which the defendant was under arrest.

We next conclude that the Commonwealth failed to carry its burden to show that the defendant's subsequent surrender of the

key constituted valid consent to the search of the glove compartment, untainted by the coercive effect of the preceding police misconduct.  In the absence of an alternative ground for affirmance, we reverse the order denying the defendant's motion to suppress.

Background.  We recite the facts found by the motion judge, supplemented by uncontroverted evidence at the motion hearing that is consistent with the judge's findings.  See Commonwealth v. Alexis, 481 Mass. 91, 93 (2018).  The admitted evidence included audio-visual recordings of the traffic stop from police body-worn cameras.  See Commonwealth v. Yusuf, 488 Mass. 379, 381 (2021), citing Commonwealth v. Clarke, 461 Mass. 336, 341 (2012) (appellate court stands in same position as motion judge in viewing documentary evidence).

1.  Traffic stop.  On the evening of August 29, 2022, Boston police Officers Ryan Fullam and Christopher Hegerich were patrolling the Nubian Square neighborhood of the Roxbury section of Boston in an unmarked police cruiser.  They were assigned to patrol the area following a series of shootings and other violent crimes there that summer.  At around 8:20 P.M., Fullam observed a vehicle traveling in the opposite direction with window tinting that appeared to violate the minimum light transmittance required by law.  See G. L. c. 90, § 9D.  Based on his training and experience, Fullam believed that window tint

often is used to evade detection by opposing gang members, and, in recent months, Fullam had recovered firearms four times as a result of traffic stops for illegal window tint. The officers decided to stop the vehicle.

Once the vehicle stopped, Fullam approached, carrying a flashlight. He shined the flashlight through the rear windshield and saw the front seat passenger reach down toward the console or glove compartment area and, with some force, make a pushing motion. Fullam relayed his observation to Hegerich.

Hegerich approached the driver's side of the car. The defendant lowered the window and, after repeated requests by the officer, shut off the vehicle. Hegerich asked her for her license and registration. The defendant was identified, and Fullam recognized her as a member of a specific gang.

Fullam, on the passenger's side of the vehicle, asked the passenger what he had "stuff[ed] in the console," to which the passenger answered, in essence, that he did not know what Fullam was asking about. After further exchanges between the passenger and Fullam, during which the defendant admonished the passenger not to argue with police, the officers issued an exit order for the passenger, handcuffed him, conducted a patfrisk of his person, and informed him that he was being detained for reasons of officer safety.

Hegerich subsequently ordered the defendant to get out of the vehicle, and she complied.  Hegerich conducted a patfrisk of her person, pulled a bag with small bundles of marijuana from the left pocket of her shorts, and returned the bag to her pocket.  He asked the defendant if there were any weapons in the vehicle, and she did not answer.  Hegerich did not handcuff the defendant then, and she walked away from the vehicle to join her passenger on the sidewalk.

Hegerich then pat frisked the vehicle for weapons.  He observed that the glove compartment was locked and asked the defendant whether she had the car key; he had seen her holding a key.[1]

On hearing the request, the defendant placed her left hand in her pocket and asked Hegerich why he needed the key, to which Hegerich responded that he "just need[ed]" it.  Hegerich directed her to take her hand out of her pocket, and when she did not comply, he removed her hand from her pocket and began to take from her hand an object that appeared to be a key.  The defendant jerked her hand away, asking, "For what?"

---

[1] The motion judge did not make a finding whether the defendant had one single car key or multiple keys, and the record is not clear on this question.  We, like the judge, at times refer to the defendant's key or keys, in accord with the inconsistent references in the record.  The distinction is not material in our discussion.

The officers then sought to place handcuffs on the defendant while the defendant continued to ask the officers why they needed her key. Refusing to comply with the officers' commands to put her hands behind her back, the defendant yanked her arm away and pushed against the officers. Fullam called for assistance over his police radio as the struggle continued. Eventually, after Hegerich told the defendant that he was going to "spray" her, the officers were able to handcuff her, about one minute after her refusal to remove her hand from her pocket.

Once the defendant was in handcuffs, Fullam repeatedly asked her where her keys were. The defendant did not answer the questions. Meanwhile, Hegerich patted the outside of the defendant's left pocket; Fullam reached into the same pocket; and Hegerich again patted the outside of the pocket and manipulated its fabric from the outside. Fullam then patted the outside of the defendant's shorts again, including in the area of her buttocks.

The officers called for assistance from a female officer to perform a further search of the defendant, and meanwhile additional male officers also arrived in response to the initial call for assistance. Fullam explained to the newly arrived officers that the defendant had been holding her keys, and "we lost [them] in the fight." Hegerich and the responding officers looked on the ground for the keys, and Hegerich commented that

they were "probably [still] on her." As the search for the keys continued, Fullam stated, "Worst comes to worst we get a search warrant." A call then was made for a K-9 police officer.

Boston police Officer Astrid Gonzalez and her partner, Officer Ana Depina, heard the radio request for a female officer. After arriving at the scene, they spoke with Fullam, who requested that they search the defendant for car keys. Depina thoroughly pat frisked the defendant's person over her T-shirt and shorts, including feeling along the edges of her bra; examined the waistband of the defendant's shorts by placing fingers on the inside and outside of the waistband and feeling along its circumference; and also turned inside out the defendant's pockets and examined the contents. No key was found.

Gonzalez then asked the defendant in a quiet, conversational tone to give police her car keys. In the same tone, Depina told the defendant that, if the summoned police dog gave an alert, even if a false positive, police were "just going to ransack [the] vehicle." If, however, the defendant gave them the keys, Gonzalez added, "[t]hey're not going to break it." Gonzalez told the defendant that refusing to give up the keys was "not worth it in the long run." The defendant did not respond.

While Gonzalez and Depina searched and spoke to the defendant, the supervising sergeant arrived at the scene. Fullam reported to him on the stop, the struggle when the officers sought to handcuff the defendant, and the missing key. He told the sergeant that the officers were "looking for the keys to get into the glove [compartment]."

As search of the area for the key continued, Fullam and Hegerich spoke with Gonzalez, who confirmed that she and Depina had not found a key in their search of the defendant. Hegerich instructed her to perform another search and "go as deep as you can go."

Gonzalez and Depina then performed their second search of the defendant's person. Depina placed her hands underneath the defendant's T-shirt, asked the defendant if she was wearing a "sports bra," and searched the defendant by feeling beneath the T-shirt and over the defendant's bra and undershirt. This search beneath the defendant's T-shirt briefly exposed portions of the defendant's undershirt and bare stomach. Gonzalez then pat frisked the back and crotch area of the defendant's shorts. Gonzalez also pulled on the shorts' elastic waistband and felt the waistband for keys. Again, nothing was recovered.

While Depina and Gonzalez performed this final search of the defendant's person, a K-9 officer arrived with a dog trained to detect firearms and explosives. The dog gave alerts for the

passenger's side door and, once the door was opened, bit the glove compartment, signaling the presence of firearm evidence.

Fullam approached the defendant, who remained handcuffed on the sidewalk, and explained to her:

> "This is where we're at, okay?  The dog hit on your glove box for a firearm.  So, what's going to happen unless you give us the keys is we're going to get a search warrant on the car, that we have probable cause at this point.  We're going to tow your car; we're going to get a search warrant. So, you can tell us where the keys are now and avoid not having a car for a few days, . . . and deal with it now, or . . . you know what I'm saying.  Essentially, that glove box is going to be opened whether it's a few days or now. Ok, right now, you're detained.  Ok, but we're going to apply for a search warrant."

The defendant acknowledged she understood but renewed her request to know why police wanted her key.  Fullam answered, "We can talk about that in court," and repeated that they were going to apply for a search warrant.  Hegerich stated that, if officers obtained a search warrant but did not have the key, then "we pry the car open," adding that the process of towing without keys "usually does damage to the car anyway."  Fullam then told the defendant he would give her "a few minutes" to decide and walked away.

Thereafter, Gonzalez and Depina continued to encourage the defendant to surrender the car key.  The defendant did not respond.

While Gonzalez and Depina still were speaking with the defendant, less than one minute after Fullam had last spoken

with her, Fullam returned and told her that he was calling the tow truck, so she had "to make that decision." The defendant, without speaking, placed her handcuffed hands into the rear of her shorts and produced the car key for the officers.

Fullam used the key to open the glove compartment, in which he discovered a firearm and pills. Asked by an officer to produce her license to carry, the defendant responded that she did not have one. Fullam then read the defendant her rights under Miranda v. Arizona, 384 U.S. 436 (1966).

2. Proceedings below. Following the traffic stop, a complaint issued against the defendant charging her with firearm offenses, drug offenses, two counts of assault and battery on a police officer, and a civil window tint infraction. The defendant subsequently was indicted on charges of carrying a firearm without a license, carrying a loaded firearm without a license, possessing a large capacity magazine, unlawfully possessing ammunition, possessing a firearm during the commission or attempted commission of a felony, trafficking in thirty-six grams or more of cocaine, and possessing with intent to distribute amphetamine.

In the Superior Court, the defendant moved to suppress the evidence against her resulting from the traffic stop under G. L. c. 276, §§ 1-8; the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution; and arts. 10, 12,

and 14 of the Massachusetts Declaration of Rights. After an evidentiary hearing, the judge denied the defendant's motion. The judge held that that the stop of the vehicle for the window tint infraction, the exit orders directed to the defendant and her passenger, and the initial patfrisk of the defendant all were lawful, but that the Commonwealth had failed to meet its burden to demonstrate the lawfulness of the subsequent searches of the defendant's person. The judge nonetheless denied the motion to suppress on the grounds that the defendant freely and voluntarily consented to the search of her glove compartment when she later turned over her key to police, and that the consent was valid because by then the unlawful police conduct had been sufficiently attenuated by time and intervening events.

A single justice of this court allowed the defendant's application for leave to pursue an interlocutory appeal and reported the appeal to the Appeals Court under Mass. R. Crim. P. 15 (a) (2), as amended, 476 Mass. 1501 (2017). We transferred the appeal to this court on our own motion.

Discussion. The defendant argues that the evidence found by police in their search of her glove compartment must be suppressed as the fruit of unlawful repeated searches of her person by police. She contends that the motion judge erred in concluding that the surrender of her car key amounted to valid consent to the warrantless search, because the Commonwealth did

not carry its burden to demonstrate attenuation of the preceding police misconduct.  The Commonwealth defends both the propriety of the officers' conduct during the stop and the validity of the defendant's subsequent consent.[2]

"'In reviewing a ruling on a motion to suppress evidence, we accept the judge's subsidiary findings of fact absent clear error,' and we defer to the judge's determination of the weight and credibility to be given to oral testimony presented at a motion hearing."  Commonwealth v. Hoose, 467 Mass. 395, 399 (2014), quoting Commonwealth v. Contos, 435 Mass. 19, 32 (2001).  "Where a judge's findings are based on recorded evidence, we are

---

[2] In addition to her argument for suppression based on the repeated searches of her person, the defendant also argues that the evidence must be suppressed as the fruit of custodial interrogation in the absence of Miranda warnings.  Deciding this case as we do, we need not consider this issue or the Commonwealth's related waiver argument.  We note that, in responding to the defendant's Miranda argument, the Commonwealth contends in part that suppression is not required because the evidence was not obtained by exploitation of any tainted statements by the defendant but instead was obtained through "an independent source," namely, "the dog hit on the glove box." The Commonwealth's brief makes no argument under the independent source doctrine with respect to the repeated searches of the defendant's person, and the Commonwealth did not raise any argument before the motion judge under either the independent source doctrine, cf. Commonwealth v. Pearson, 486 Mass. 809, 814-815 (2021) (discussion of doctrine presupposing that police obtained search warrant), or the inevitable discovery doctrine, see generally Commonwealth v. Chism, 495 Mass. 358, 400 (2025), citing Commonwealth v. O'Connor, 406 Mass. 112, 119 (1989).  We therefore do not consider any such argument.  See Commonwealth v. Beverly, 485 Mass. 1, 16 (2020).

in as good a position as the motion judge to evaluate that evidence." Hoose, supra. "However, where, as here, the judge considered the recorded evidence in light of oral testimony at the motion to suppress hearing and made credibility determinations therefrom, we adhere to the normal standard of review." Id. at 399-400, citing Clarke, 461 Mass. at 340-341. We conduct an independent review of the judge's application of constitutional principles to the facts found. See Commonwealth v. Buckley, 478 Mass. 861, 864 (2018).

1. Search incident to arrest. Although the Commonwealth contends that the initial searches of the defendant's person were justified under the Fourth Amendment and art. 14 as "a 'carefully limited search of the outer clothing of [the defendant] . . . to discover weapons' for safety purposes" during the traffic stop, Torres-Pagan, 484 Mass. at 36, quoting Terry v. Ohio, 392 U.S. 1, 30 (1968), the Commonwealth does not claim error in the motion judge's conclusion that the final and most intrusive search of the defendant's person exceeded the permissible scope of such a search for officer safety purposes. Instead, the Commonwealth newly argues on appeal that the final search was a proper search incident to the defendant's arrest

for assault and battery on a police officer.[3]  The Commonwealth's argument fails on statutory grounds.

Although the Fourth Amendment and art. 14 permit police to perform a search without a warrant incident to a lawful arrest, see Commonwealth v. Mauricio, 477 Mass. 588, 592 (2017), our Legislature has imposed a limit on such searches.  General Laws c. 276, § 1, second par., provides:

> "A search conducted incident to arrest may be made only for the purposes of seizing fruits, instrumentalities, contraband, and other evidence of the crime for which the arrest has been made, in order to prevent its destruction or concealment; and removing any weapons that the arrestee might use to resist arrest or effect his escape.  Property seized as a result of a search in violation of the provisions of this paragraph shall not be admissible in evidence in criminal proceedings."  (Emphases added.)

The statute thus "authorizes a search to be made incident to an arrest only (1) for the purpose of seizing evidence of the crime for which the arrest has been made in order to prevent its destruction or concealment or (2) for the purpose of removing any weapon the person arrested might use to resist arrest or to escape."  Commonwealth v. Blevines, 438 Mass. 604, 607 (2003), quoting Commonwealth v. Wilson, 389 Mass. 115, 118 (1983).  A search may not, however, be made for an "investigatory purpose

---

[3] The parties do not dispute, and we therefore assume without deciding, that at the time of the challenged searches the police both had probable cause to arrest the defendant for assault and battery on a police officer and had in fact placed her under arrest for that offense.

unrelated to the crime for which the defendant [is] being arrested." Blevines, supra at 609. In this respect, the statute "is more restrictive than the Fourth Amendment" (quotation omitted). Id. at 607. Whether a search was made for a purpose permitted under the statute is assessed based on the circumstances reflected in the record under "an objective standard." Id. at 608.

Here, the defendant was under arrest for assault and battery on a police officer following a physical altercation on a public sidewalk in which, using her hands and body, she combatted the officers' attempts to handcuff her. See note 3, supra. The statute thus required that any search incident to this arrest be made for the purpose of (1) seizing evidence of the assault and battery, or (2) disarming the defendant of any weapon she might use to resist arrest or escape. See G. L. c. 276, § 1, second par.; Blevines, 438 Mass. at 607.

As to the first permissible purpose, the Commonwealth does not contend that the search was justified to seize a "fruit[]," "instrumentalit[y]," or piece of "evidence" of the assault and battery for which the defendant was under arrest. G. L. c. 276, § 1, second par. Indeed, it is "difficult to conceive" what evidence of the defendant's physical acts against the officers could have been concealed on her person. Commonwealth v. Toole, 389 Mass. 159, 162 (1983) (likewise "difficult to conceive" what

evidence of prior assault and battery could be found in search of defendant's vehicle incident to his arrest on outstanding arrest warrant for that offense).

And the record forecloses the Commonwealth's argument that the searches were limited to the second permissible purpose of disarmament. The Commonwealth correctly notes that car keys may, in appropriate circumstances, be seized as a potential weapon during a patfrisk incident to arrest. See Blevines, 438 Mass. at 608. Here, however, the repeated searches of the defendant's person had the impermissible purpose to investigate a crime different from the assault and battery for which the defendant was under arrest. See id. at 609. As the motion judge found, police officers repeatedly requested -- before, during, and after the challenged searches -- that the defendant give them her car keys and told her that they would use the keys to open the locked glove compartment; the female officers who performed the two most thorough searches of the defendant's person were instructed to look for the car keys; Fullam meanwhile reported to the supervising sergeant that they were "looking for the keys to get into the glove [compartment]"; and, after obtaining the key, the officers in fact used it to open the locked glove compartment to investigate its contents. The Commonwealth does not dispute these factual findings, which are amply supported by both the testimony of the officers and the

police body-camera footage.  These undisputed facts establish

that the repeated searches of the defendant's person for the key

had an impermissible "investigatory purpose unrelated to the

crime for which the defendant was being arrested" -- namely, as

in Blevines, obtaining and using the defendant's car key to

investigate another crime.  Id.[4]

We thus reject the Commonwealth's argument that the final

and most intrusive search of the defendant was lawful as a

search incident to arrest under G. L. c. 276, § 1.[5]  We therefore

_____

[4] Because the officers' use of the key they sought in their
searches of the defendant thus establishes that, under the
objective standard set forth in Blevines, 438 Mass. at 608-609,
the searches of the defendant had an investigatory purpose that
is not permissible under G. L. c. 276, § 1, second par., we need
not revisit in this case our interpretation of that statute,
including the extent to which the standard for determining the
"purposes" of a search under the statute accords with the
objective standard applicable in assessing the constitutionality
of a traffic stop under art. 14.  Cf. Blevines, supra at 608,
citing Commonwealth v. Santana, 420 Mass. 205, 208 (1995).

[5] Having so concluded, we need not consider the propriety of
the preceding less intrusive searches of the defendant's person.
And we decline on this record to consider the Commonwealth's new
argument on appeal that the scope of the final search of the
defendant's person was reasonable under the Fourth Amendment and
art. 14 because the dog's alert to the presence of firearm
evidence occurred -- and gave the police probable cause to
search the glove compartment -- before the female officers
performed the most intrusive aspects of the final search.  Cf.
Commonwealth v. Washington, 449 Mass. 476, 483 (2007) (reviewing
court may affirm denial of motion to suppress evidence "on any
ground supported by the record").  The Commonwealth did not
develop a record at the evidentiary hearing regarding the
relative timing of the dog's alert and the various aspects of
the officers' final search of the defendant's person; the motion
judge accordingly made no findings on this point; and the

turn to the question whether the defendant validly consented to the search of her locked glove compartment when, after the repeated searches of her person culminating in the unlawful final search, she handed the police her car key.

2. Consent to search and attenuation. A warrantless search of a private vehicle is presumptively unreasonable under both the Fourth Amendment and art. 14 unless one of the established exceptions to the warrant requirement applies. See Buckley, 478 Mass. at 875. The sole ground on which the motion judge upheld the search of the defendant's glove compartment was the consent exception. See id. The judge found that the defendant freely and voluntarily consented to the search when she ultimately removed her car key from the back of her shorts and handed it to the officers. See Commonwealth v. Carr, 458 Mass. 295, 302 (2010), quoting Commonwealth v. Walker, 370 Mass. 548, 555, cert. denied, 429 U.S. 943 (1976) (voluntariness of consent is generally question of fact, with burden on government to prove "consent unfettered by coercion, express or implied, and also something more than mere acquiescence to a claim of

_____

relative timing is not self-evident from the police body-worn camera footage, in part because Gonzalez's camera did not capture during the final search any indication that the dog's alert had occurred. Concluding only that the Commonwealth's new argument finds insufficient factual support in the record, we express no view on its merits.

lawful authority" [quotation omitted]).  And the judge further concluded that this consent was valid, because the Commonwealth had met its burden to prove attenuation of the preceding police misconduct.  The defendant challenges the judge's conclusion as to the validity of the consent.

"When consent to search is obtained through exploitation of a prior illegality, particularly very close in time following the prior illegality, the . . . compromised consent has been thought to be tainted and inadmissible."  Commonwealth v. Fredericq, 482 Mass. 70, 81 (2019).  The court must determine whether the evidence for which suppression is sought "has been come at by exploitation of [that] illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Id. at 78, quoting Commonwealth v. Damiano, 444 Mass. 444, 453 (2005).  The Commonwealth bears the burden of proving such attenuation of the underlying illegality.  Commonwealth v. Robinson, 497 Mass. 156, 164 (2026).  While no single fact is dispositive, we consider (1) the temporal proximity between the illegal search or seizure and the defendant's alleged consent, (2) the presence of intervening circumstances, and particularly (3) the purpose and flagrancy of the official misconduct.  See id.; Commonwealth v. Loughlin, 385 Mass. 60, 63 & n.4 (1982), citing Brown v. Illinois, 422 U.S. 590, 603-604 (1975).  Because attenuation "turn[s] on the 'application of constitutional

principles to the facts found,' we 'review independently' the motion judge's determination[]" (citation omitted). Commonwealth v. Diaz, 496 Mass. 210, 213 (2025). See id. at 214, quoting Commonwealth v. Nelson, 460 Mass. 564, 570-571 (2011) (describing dual purposes of exclusionary rule "to deter police misconduct and preserve judicial integrity by dissociating courts from unlawful conduct").

We begin by rejecting the Commonwealth's argument that, because the repeated searches of the defendant's person did not yield evidence against her, "it cannot be said that the defendant's consent was derived from those searches." The final search of the defendant's person for her car key followed a series of other such searches, including a prior thorough search by a female officer, and it was, as the motion judge found, more intrusive than a patfrisk in several respects, including that an officer manually searched beneath her T-shirt over her bra and undershirt. Cf. Terry, 392 U.S. at 16-17 (patfrisk alone constitutes "serious intrusion on the sanctity of the person"). As such, the final search was coercive in nature. The motion judge therefore correctly determined that, to uphold the search of the glove compartment on the ground that the defendant validly consented to it, the Commonwealth bore the burden to show that the defendant's choice to give police her key was not

tainted by the preceding police misconduct.  See Fredericq, 482 Mass. at 78.[6]

The first attenuation factor, the length of time between the search of the defendant's person and her subsequent consent, weighs against attenuation.  See generally Diaz, 496 Mass. at 216 ("a defendant's conduct that immediately follows illegal police action is more likely to be responsive thereto").  Approximately three minutes elapsed between the final, most invasive search in the series of searches of the defendant's person and her surrender of the key.  During these few minutes, Fullam informed the defendant that the police dog had alerted to the presence of firearm evidence in the glove compartment and told her that she could have "a few minutes" to make the decision whether to surrender the key.  Fullam then approached the defendant again approximately thirty seconds later, informing her that he was going to call the tow truck "now" and

---

[6] In Fredericq, 482 Mass. at 81 n.8, we observed that "[t]he attenuation analysis regarding whether a defendant's consent is tainted by an illegal search must differ somewhat from the analysis regarding whether a defendant's postarrest statements are tainted by an illegal arrest," and that "the potential taint arising from an illegal search generally comes from the defendant being confronted with the information derived from the illegal search, which may influence what the defendant says and his or her willingness to consent to a [further] search" (emphasis added).  In the circumstances here, however, the question is whether the taint of the unlawful and coercive search of the defendant's person for the key had dissipated by the time she chose to hand the officers the key.  See id.

that she had to "make that decision."  All the while, Gonzalez
continued her efforts to encourage the defendant to part with
the car key.  In these circumstances, we cannot conclude that
"significant time elapsed between the illegality and the
'consent.'"  Loughlin, 385 Mass. at 64.  See Robinson, 497 Mass.
at 164 (interval of "less than two minutes" between unlawful
exit order and consent "strongly favor[ed]" suppression).

The second factor, intervening events, weighs in favor of
attenuation.  As the motion judge found, the dog's alert,
together with the information from Fullam that a tow truck was
coming and that police were seeking a warrant, provided the
defendant with new information after the searches of her person.[7]
During the period of time when police were performing their
searches of the defendant's person in order to find her car key,
Depina and Gonzalez had warned the defendant that the summoned
dog might give an alert and that officers then were "just going

---

[7] The judge implicitly found, and the record supports, that
the defendant learned of the dog's alert only after the final
search was complete.  Thus, from the defendant's perspective,
regardless of the precise moment the dog's alert occurred, see
note 5, supra, the alert intervened between the final unlawful
search and the defendant's decision to hand over the key.  And,
because we are concerned here with the coercive effect of the
search on the defendant, new information with which the
defendant was confronted during the period following the search
is relevant, see Fredericq, 482 Mass. at 81 n.8, even if that
information was obtained by police while the unlawful conduct
was still ongoing.

to ransack [the] vehicle" and "break it" unless the defendant gave them the key.[8]  It thus would have been newly apparent to the defendant as a result of the dog's alert that discovery of the firearm by police was certain one way or another and that surrendering her key might avoid damage to her car from a keyless tow and search.[9]  Further, as the judge also found, the defendant had refused repeated police demands for the key throughout the period of the searches of her person and gave police the key only after the dog's alert.  These intervening circumstances weigh in favor of attenuation.

The third and final factor, regarding the purpose and flagrancy of police misconduct, weighs against attenuation. "When weighing this factor, 'we ask, first, whether police performed the illegal act for the purpose of obtaining the evidence that the defendant seeks to suppress, and second,

---

[8] Deciding this case as we do, we need not consider further the propriety of the police comments regarding "ransack[ing]" the defendant's vehicle, nor whether this discussion of the prospect of the dog's alert during the period of the searches of the defendant's person rendered the actual alert not entirely independent of the unlawful conduct.  Cf. Diaz, 496 Mass. at 216 ("when viewed as a whole," illegal stop, defendant's flight, and attempted disposal of evidence "more plausibly construed as a single 'entangled' nexus than as a sequence of distinct and independent events" [citation omitted]).

[9] The motion judge found that the defendant also sought to avoid the inconvenience of waiting for a search warrant to issue and be executed.  Such an inconvenience too would have appeared inevitable following the dog's alert.

whether the police knew that their actions were illegal but proceeded anyway.'" Diaz, 496 Mass. at 215, quoting Commonwealth v. Long, 476 Mass. 526, 537-538 (2017). While the judge made no factual findings regarding whether the officers knew their conduct was illegal, she did find that they performed the challenged searches because they wanted to find the defendant's key to open the locked glove compartment and investigate what was located inside it. As discussed above, these findings were amply supported by the record. Police thus sought, by searching the defendant's person, an unlawful "shortcut" to obtain evidence they suspected they would find in the glove compartment. Commonwealth v. Webster, 75 Mass. App. Ct. 247, 255 (2009), quoting Commonwealth v. McAfee, 63 Mass. App. Ct. 467, 481 (2005). Accordingly, "[a]pplication of the exclusionary rule in this situation could" indeed have a "deterrent effect on the behavior of [the police]" (citation omitted). Damiano, 444 Mass. at 458-459.

In sum, there was no significant break in time between the unlawful search of the defendant's person and her purported consent, amounting to only three minutes during which officers continued to press her to surrender the key; after the unlawful search, the defendant was informed that a dog had alerted to the presence of a firearm in her locked glove compartment, rendering a search of the glove compartment inevitable, and, having been

warned by police of the prospect of damage to her vehicle if she did not give them her key to use in searching the vehicle, she gave them the key for use in the search; and police had performed the unlawful search of the defendant's person for the purpose of finding the key to obtain evidence they suspected they would discover in the glove compartment.  In these circumstances, we cannot conclude that the Commonwealth has demonstrated that the evidence the police obtained using the car key is sufficiently attenuated from the preceding unlawful conduct so as to be purged of its taint.  See Fredericq, 482 Mass. at 78.  In other words, the defendant's handover of her car key did not amount to valid consent to the search.  See Robinson, 497 Mass. at 164.

The motion judge's conclusion to the contrary rested on an attenuation analysis that was incomplete.  Guided by Commonwealth v. Kipp, 57 Mass. App. Ct. 629, 633 (2003), the judge concluded that it could "rationally be determined that [the consent] did not come about by virtue of the prior illegality, but rather was given for reasons independent of the earlier unlawful act or event"; the defendant had been given time to consider her decision and decided to relinquish her car key only after the intervening event of the dog's alert, in order to avoid damage to her car and the inconvenience of waiting for a search warrant to issue and be executed.  Similar

to the analysis in Kipp, however, the judge did not go on to address whether the purpose or flagrancy of the police misconduct weighed in favor of attenuation, despite having found that the officers performed the repeated searches of the defendant's person in order to obtain her car key to open the glove compartment. We underscore today that the purpose and flagrancy of police misconduct are relevant to the validity of consent following an unlawful search or seizure. See Fredericq, 482 Mass. at 81-82. See also Commonwealth v. Suters, 90 Mass. App. Ct. 449, 460 (2016) (significance of purpose and flagrancy derives from their "tie[s] to the purpose underlying the exclusionary rule").

We thus conclude that the warrantless search of the defendant's glove compartment cannot be upheld on the ground that the defendant validly consented to the search.

Conclusion. The order denying the defendant's motion to suppress is reversed. The case is remanded to the Superior Court for entry of an order allowing the defendant's motion to suppress and for such further proceedings as may be appropriate.

So ordered.

GEORGES, J. (concurring).  I concur in the court's judgment reversing the order denying the defendant's motion to suppress. The repeated searches of the defendant's person exceeded the limits of a lawful search incident to arrest under G. L. c. 276, § 1, and the Commonwealth failed to establish that the defendant's eventual surrender of the car key was sufficiently attenuated from the preceding misconduct to constitute valid consent.  I write separately because this case illustrates the significance of body-worn camera footage in suppression analysis under G. L. c. 276, § 1, and to explain why the recordings here independently confirm that the searches lost their statutory bases.

Body-worn camera footage is not merely corroborative. Recordings often provide the clearest objective account of how a search unfolded and whether it remained tied to the limited purposes G. L. c. 276, § 1, permits.  See Commonwealth v. Yusuf, 488 Mass. 379, 390 (2021) (body-worn cameras "may serve to protect police officers from allegations of damage, to memorialize and preserve the events as they transpire, and to advance interest in police accountability").  As these recordings become routine, they will be used with increasing frequency in suppression litigation under G. L. c. 276, § 1, second par.  See Yusuf, supra at 392 (noting recent increase in use of such cameras).

I begin where the relevant statutory language begins. General Laws c. 276, § 1, second par., authorizes a search incident to arrest "only" to seize evidence "of the crime for which the arrest has been made" or to remove weapons "the arrestee might use to resist arrest or effect [the arrestee's] escape."  The Legislature's choice of the word "only," coupled with the statute's enumeration of two permissible aims, deliberately constrains search authority below the constitutional floor set by United States v. Robinson, 414 U.S. 218, 234-236 (1973), which held that a search incident to arrest is reasonable even where the search for contraband or evidence is unrelated to the crime of arrest.

Massachusetts law rejects the broader Federal rule that a custodial arrest, standing alone, supplies categorical justification for a search of the arrestee for any evidence, irrespective of the relation of that evidence to the offense for which that person has been arrested.  See Commonwealth v. Wilson, 389 Mass. 115, 118 (1983) (G. L. c. 276, § 1, was Legislature's repudiation of holding in Robinson).  As we explained in Commonwealth v. Blevines, 438 Mass. 604, 610 (2003), the statute forecloses the use of an arrest as a conduit to a generalized evidentiary search.  The permissible scope remains tethered, at every moment, to the offense of arrest and the specific safety concerns the Legislature identified.

That textual command carries two consequences important to this case.  First, the lawfulness of a search incident to arrest is not fixed at the instant of arrest.  It is a continuing condition on the scope of the search as the search progresses.  Once the search ceases to serve either of the two enumerated purposes, statutory authority for it ends.  Second, the inquiry is objective.  See Blevines, supra at 608.

That the inquiry is objective, however, does not mean it is frozen in time or divorced from the record of what occurred.  Blevines prevents courts from invalidating a search based on speculation about an officer's unspoken thoughts.  It does not require courts to disregard what officers say and do while the search is underway.  Cf. Commonwealth v. Buckley, 478 Mass. 861, 868 (2018) (objective analysis for traffic stops "avoids this often-speculative probing of the police's 'true' motives," while providing "administrable rule" for both law enforcement and reviewing courts).  Statements directing the scope of a search or instructing officers how to proceed are not hidden mental states.  Cf. Commonwealth v. Matta, 483 Mass. 357, 364 (2019) (determining moment of seizure -- an objective inquiry -- based on what officer said to defendant).  They are observable features of the encounter, and they bear directly on the question Blevines requires courts to confront:  what is the objective purpose of the search?

The distinction is between motive and conduct. Officers' contemporaneous words can be conduct, such as when they issue orders. See Matta, 483 Mass. at 364 ("we look to whether an officer has communicat[ed] what a reasonable person would understand as a command that would be enforced by the police power" [quotation and citation omitted]). They form part of the record courts must examine in deciding whether a search served a statutorily permissible purpose. To disregard that record would not preserve objectivity. It would artificially shrink the record and require courts to assess the legality of a search while disregarding what officers said and did as the encounter unfolded.

Body-worn camera footage fits within the framework Blevines requires because it captures the progression of the search as it occurred in real time. The recordings preserve officers' real-time directives, explanations, and investigative focus. They do not reveal hidden motives. They show the search as it happened. The recordings here document a continuous, escalating effort to gain access to the locked glove compartment of the defendant's vehicle. At the outset, the circumstances gave a reasonable officer legitimate safety concerns. Fullam observed movements toward the console, and he and Hegerich were entitled to take reasonable steps to secure the scene. The problem is not that the officers investigated those concerns. The problem is that

as the searches progressed, their purpose did not remain tied to the limited purposes G. L. c. 276, § 1, authorizes. Three features captured on the recordings make the progression unmistakable.

First, before the defendant was arrested, she was issued an exit order and pat frisked without incident. Hegerich then ordered her to stand to the side of the car under the supervision of Fullam while Hegerich searched the vehicle. It was only after Hegerich observed that the glove compartment was locked that he and Fullam repeatedly demanded her key after observing her holding what appeared to be one. When the defendant asked why the key was needed, Hegerich responded only that he "just need[ed]" it.

Equally significant, the initial frisk disclosed no weapon. Once that frisk dispelled the immediate safety concern, and while the defendant remained restrained and monitored by multiple officers, neither the defendant's resistance during handcuffing nor the dog's later reaction to the glove compartment provided an objective basis for successive and increasingly intrusive searches for weapons. Yet the officers' efforts intensified after the locked glove compartment was discovered. That progression is itself objective evidence that the searches had shifted away from the limited statutory

purposes authorizing a search incident to arrest.[10]  See

Commonwealth v. Washington, 449 Mass. 476, 481 (2007) ("search

may precede the formal arrest" only if probable cause exists

"independent of the results of the search").

Second, after the defendant had been restrained and

officers were searching unsuccessfully for the missing key,

Fullam stated, "Worst case, like we said, we get a dog and a

search warrant."  Viewed in context, the statement reflected

that the encounter had shifted toward obtaining evidence from

the glove compartment rather than preserving evidence of the

arrest offense or addressing officer safety concerns.

Third, the most intrusive searches were directed expressly

toward locating the key.  Fullam told the supervising sergeant

that officers were "looking for the keys to get into the glove

---

[10] The cases cited by the Commonwealth to suggest that the officers' conduct fell under reasonable suspicion or safety concerns are inapposite.  The cited cases involved either an initial protective frisk supported by contemporaneous safety concerns or additional facts renewing those concerns during the encounter.  See, e.g., Commonwealth v. Guardado, 491 Mass. 666, 669, 682, S.C., 493 Mass. 1 (2023), cert. denied, 144 S. Ct. 2683 (2024); Commonwealth v. Johnson, 454 Mass. 159, 164 (2009); Commonwealth v. Rock, 429 Mass. 609, 610 (1999); Commonwealth v. Graham, 78 Mass. App. Ct. 127, 128-130 (2010); Commonwealth v. Mathis, 76 Mass. App. Ct. 366, 368, 373 (2010).  Here, by contrast, officers conducted increasingly intrusive searches after the initial frisk yielded no weapon and without any intervening facts renewing an objectively reasonable concern for officer safety.  Nor did the defendant's physical resistance to the officers justify renewed concern for weapons on the defendant's person, or create any link to the locked glovebox.

[compartment]." Hegerich later instructed another officer conducting the final and most invasive search to "go as deep as you can go." By that point the defendant had been handcuffed and searched repeatedly. Neither the offense that resulted in the defendant's arrest nor any plausible concern about weapons explained why the officers continued to penetrate her person at that depth. Instead, the search conduct, viewed together with the officers' contemporaneous directives, objectively demonstrated that the encounter had shifted toward obtaining access to the glove compartment.

None of this means that an isolated or ambiguous remark by an officer will dictate the validity of a search. Trial courts must evaluate body-worn camera evidence in context and alongside the rest of the record. Some statements will carry little weight. Others may reflect frustration, shorthand among colleagues, or imprecise wording during a fluid encounter. Yet where recordings show a sustained effort by police to obtain evidence of a crime unrelated to the arrest, beginning even <u>before</u> probable cause for that arrest existed, courts need not ignore contemporaneous statements and investigative directives in the name of objectivity. The recordings themselves may objectively establish that the search has crossed the line <u>Blevines</u> draws.

That is what occurred here.  The body-worn camera footage did more than corroborate the motion judge's findings.  <u>Ante</u> at    .  The recordings themselves showed that the searches evolved from measures justified by the offense of arrest or concerns for officer safety into an effort to obtain access to the locked glove compartment for investigative purposes unrelated to either the traffic stop or the subsequent arrest.  Once the searches no longer served the limited purposes identified in G. L. c. 276, § 1, they exceeded the permissible scope of a search incident to arrest.  See <u>Blevines</u>, 438 Mass. at 609.

<u>Blevines</u> does not require courts to disregard contemporaneous evidence bearing on the objective character and progression of a search.  It requires only that courts avoid speculation about unexpressed motives.  In an era when police encounters are routinely recorded in real time, fidelity to that principle requires courts to engage with the record before them.  Because the recordings here objectively demonstrate that the searches exceeded the limits imposed by G. L. c. 276, § 1, I concur.